UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TERAS CHARTERING, LLC, | CASE NO. C16-0188RSM |
| Plaintiff, | ORDER GRANTING IN ADDITIONAL PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| HYUPJIN SHIPPING CO., LTD, | |
| Defendant. | |

## I.    INTRODUCTION

This matter comes before the Court on the remainder of Defendant Hyupjin Shipping Co., Ltd.'s ("Hyupjin") Motion for Summary Judgment.  Dkt. #22.  Defendant initially sought summary judgment on three issues: (1) whether it was entitled to a "reasonable time under the circumstances" for discharging its cargo at a particular port; (2) whether it is entitled to 6.2187 days of "grace period" to offset any delay the Court might find in loading or discharge operations; and (3) whether its 6.2187 days of "grace period" exceeds any period of delay, negating any liquidated damages for Plaintiff.  *Id.* at 1-2.  Plaintiff opposed the motion, primarily arguing that disputes over material fact preclude judgment in favor of Defendant.  Dkt. #28.

On May 31, 2017, this Court granted Defendant's motion in part, agreeing with Defendant that it was entitled to a reasonable amount of time under the circumstances for discharging its

ORDER - 1

cargo in Venezuela.[1]  Dkt. #56.  The Court deferred ruling on the remaining issues, directing the parties to provide supplementing briefing.  *Id.*  The parties have since submitted such briefing, which this Court has reviewed.  For the reasons set forth below, the Court now GRANTS IN ADDITIONAL PART AND DENIES IN PART the remainder of Defendant's motion.

## II.    BACKGROUND

This is a contract dispute.  The dispute concerns liquidated damages pursuant to demurrage provisions of shipping agreements.[2]  Defendant is an international freight forwarder based in South Korea. Dkts. #23 at ¶ 3 and #23-1 at 22.  It chartered a ship operated by Plaintiff Teras Chartering, LLC ("Teras") to carry equipment from Asia to Venezuela for a refinery construction project.  Dkts. #9 at ¶ 4, #11 at ¶ 4 and #23-1 at 19-20.  The ship (the MV NORFOLK) was to pick up Defendant's cargo in Sattahip, Thailand, then pick up additional cargo in Masan, South Korea, and deliver the cargo in Guanta, Venezuela, 35 days later, "AGW WP" (meaning "all going well, weather permitting").  *See* Dkt. #30 at 48.

Plaintiff alleges that delays occurred in the loading and unloading of cargo at various ports, and ship time was lost as a result.  Thus, Plaintiff brings this action to recover demurrage for Defendant's alleged delays, and costs including attorney's fees. Dkt. #9 at ¶ ¶ 7-12. Defendant has filed a counterclaim, asserting that Plaintiff cannot "substantially prevail" on its claims and

---

[1]  The Court also denied pending motions for relief from the discovery deadline and for security costs, and stayed the trial date and other pending pre-trial deadlines until this motion has been fully resolved. Dkt. #56.

[2]  Demurrage is a reparation paid to the ship owner to compensate for vessel time lost by delays in loading or discharging the cargo. 2 Thomas J. Schoenbaum & Jessica L. McClellan, *Admiralty & Mar. Law* § 11-15 (5th ed. 2012).  The question of whether there has been a delay depends on calculating the period allowed for loading and unloading (called "laytime").

Defendant is therefore entitled to legal fees and costs pursuant to the Booking Notes.   Dkt. #11 at 6.

## A. Timeline of Events

As noted in its prior Order, the Court has discerned the following timeline of events leading to the instant dispute.   Dkt. #56.   On September 14, 2015, Defendant and Plaintiff negotiated an agreement, using Plaintiff's form "Booking Note," to carry Defendant's cargo aboard the United States flag vessel, MV NORFOLK, from Sattahip, Thailand to Guanta, Venezuela.   *See* Dkt. #23-1 at 66.   The Booking Note provided a "laycan" period of October 5-15, 2015. *See Id.*, Box 6.   "Laycan" refers to the window of time during which a vessel must arrive at the port to avoid cancellation by the charterer. *Kolmar Americas, Inc. v. Koch Supply & Trading, LP*, 10 CIV. 7905 JSR, 2011 WL 6382566, at *2 (S.D.N.Y. Dec. 15, 2011) and Dkt. #23-1 at 39.

At some point, it became clear that the NORFOLK would not be able to arrive in Sattahip before October 15, 2015.   Dkt. #23-1 at 12 and 14.   As a result, Defendant had the option to cancel its agreement to hire the MV NORFOLK. Dkt. #23-1 at 12, 16 and 40.   Instead, the parties amended the Booking Note on October 19th, extending the laycan period until October 25th.   *See* Dkt. # 23-1 at 13 and 72.   There appears to be no dispute that the MV NORFOLK arrived at the port of Sattahip at 0648 on October 24, 2015.   Dkt. #61, Exs. A and B.   However, there remains a factual dispute with respect to when the carrier issued a Notice of Readiness to load cargo. Defendant contends that no Notice of Readiness was ever issued, but that the vessel could not actually load cargo at Sattahip until 1000 on October 28, 2015.   *See* Dkts. #22 at 16, #23-1 at 43 and #59-1 at 6-7.   Plaintiff contends that a Notice of Readiness was issued on October 24, 2015 at 7:18 a.m.   Dkts. #60 at 6 and #61, Exs. A and B.   This dispute is significant to the remaining

issues, as further discussed below. The MV NORFOLK departed Sattahip on October 31, 2015, heading for Masan. Dkt. #61, Ex. B.

In the meantime, the parties signed another Booking Note on November 3rd regarding the transport of additional cargo from Masan to Guanta. Dkt. #23-1 at 84. That Booking Note specified a laycan period of November 3-13, 2015. *Id.* On November 12, 2015, one day before the end of the laycan, the MV NORFOLK presented her Notice of Readiness to load in Masan. Four days later, on November 16th, the MV NORFOLK departed Masan for Guanta. Dkt. #30 at 48.

Based on the record, it appears that the MV NORFOLK presented her Notice of Readiness to unload in Guanta on December 21, 2015. Dkt. #30 at 49. The next day, the MV NORFOLK began discharging cargo. Dkts. #11 at 3 and #30 at 50. Unloading then appears to have stopped entirely for a period of days. *See* Dkt. #23-1 at 10. The process of discharging cargo finished on December 30, 2015. Dkts. #9 at ¶ 7 and #11 at ¶ 7. Plaintiff now asserts claims for demurrage for alleged delays during the unloading period.[3]

## B. Contract Language in Dispute

The parties agree that the Booking Notes govern the instant dispute. The relevant aspects of the original Sattahip Booking Note include:

- Time For Shipment: October 5 –15, 2015.

- "Full Liner Terms Hook/Hook" and "[m]erchant to provide cargo at load port as fast as vessel can load; and take away from under ship at discharge port as fast as ship can discharge, otherwise vessel detention to apply for account of merchant."[4]

---

[3] Plaintiff asserts claims for delays under both the Sattahip and Masan Booking Notes. Dkt. #9 at ¶¶ 8 and 9.

[4] In a standard "charter party" (contract to charter a vessel), the owner of the cargo is responsible for discharging its own cargo when the carrier arrives at the destination. In this case, however, Plaintiff (the carrier) was responsible for unloading the cargo from the ship and Defendant was

ORDER - 4

- "Loading, Discharging and Delivery of the cargo shall be arranged by the Carrier's Agent and unless otherwise agreed . . . [t]he merchant or his assign shall tender the goods when the vessel is ready to load and as fast as the vessel can receive – but only if required by the carrier – also outside ordinary working hours notwithstanding any custom of the port."

- "Carrier shall give shipper notice of readiness of vessel to load/discharge upon arrival at each loading/discharging port when the vessel is ready to load/discharge cargo, whether the vessel is in berth or not."

- "Counting of laytime shall commence upon date/time of issuance of Notice of Readiness to load/discharge by carrier and shall continue uninterruptedly until loading/discharge has been completed. Any time in excess of the allocated laytime shall be charged as demurrage . . . ."[5]

- Defendant shall pay to Plaintiff "[d]emurrage at the rate identified in Box 11 on the face of this agreement or pro rata thereof . . . when the actions of the [Defendant] or of third parties beyond the control of [Plaintiff] cause any delay in the transport services, including loading/discharging of the goods." The demurrage rate identified in Box 11 is "USD 20,000 pdpr ("per day, prorated") plus any port, terminal, equipment, labor or other expenses."

- "Detention to count in case of swell and port congestion." [6]

- "48 hours free time for all purposes to be granted."

Dkt. #23-1 at 66-67 and 69.

The relevant aspects of the Amended Sattahip Booking Note include:

- Defendant "agrees to extend the lay-can until October 25, 2015."

- "No detention and waiting time due to swell and/or congestion to count at port of loading."

---

responsible for "taking it away." Dkt. #23-1 at 66, Boxes 13(A) and 13(C). Despite the fact that the parties never explain what "taking it away" actually entails, Defendant's failure to "take the cargo away" in Guanta in a timely manner seems to be the crux of this lawsuit.

[5] "Laytime" is the period of time allowed for loading and unloading the Vessel.

[6] The Booking Notes treat the terms "detention and demurrage" synonymously. *See* Dkt. #23-1 at 87, Clause 30.

- "[Plaintiff] to grant 0.5 days grace period each day of which [Plaintiff] missed the laycan for all purpose[sic]."

- "All other terms, conditions and exceptions of the BN shall remain unaltered."

Dkt. #23-1 at 72.

The relevant provisions of the Masan Booking Note include:

- Time for Shipment: November 3–13, 2015.

- "Grace Period – POD ("port of discharge") – as per Teras / Hyupjin Booking Note dated September 14, 2015 and Addendum dated October 19, 2015."

- "Full Liner Terms Hook/Hook" and "[m]erchant to provide cargo at loadport as fast as vessel can load; and take away from under ship at discharge port as fast as ship can discharge, otherwise vessel detention to apply for account of merchant."

- "Detention to count in case of swell and port congestion."

- Defendant shall pay to Plaintiff "[d]emurrage at the rate identified in Box 11 on the face of this agreement or pro rata thereof . . . when the actions of the [Defendant] or of third parties beyond the control of [Plaintiff] cause any delay in the transport services, including loading/discharging of the goods." The demurrage rate identified in Box 11 is "USD 20,000 pdpr plus any port, terminal, equipment, labor or other expenses."

Dkt. #23-1 at 84 and 87.

## III.    DISCUSSION

### A. Defendant's Motion for Summary Judgment

Defendant seeks judgment as a matter of law that Plaintiff is not entitled to any demurrage. Dkt. # 22. Specifically, it requests an Order declaring: (1) that Defendant was entitled to a reasonable time under the circumstances for the discharge of cargo at Guanta; (2) that, in addition to a reasonable time, Defendant had accrued 6.2187 days of "grace period;" and (3) that the "grace period" it had accrued exceeds the maximum amount of time in which cargo operations were allegedly delayed, offsetting any delays in loading or discharge of cargo that would otherwise

give rise to liability for demurrage. *Id.* at 1-2. As set forth in the Court's prior Order, the Court agrees that Defendant is entitled to a "reasonable period of time" to discharge the cargo. Dkt. #56 at 9-11. However, because what constitutes a "reasonable" period of time is a question of fact, the Court denied the remainder of Defendant's motion on that issue. *Id.* Accordingly, this Order addresses the remaining issues regarding grace period.

### 1. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 251.

### 2. Defendant's "Grace Period"

Defendant has moved for summary judgment on the issue of how many days of grace period it is entitled to cover delays, if any, in discharging cargo in Guanta. In particular,

Defendant seeks a determination that it accrued 6.2187 days of "grace period." Dkt. #22 at 1. Plaintiff argues that the amount of grace time Defendant accrued is a disputed fact. *See* Dkt. #29. Analyzing this question requires the Court to first determine whether the Booking Notes provide when and how grace period is accrued, and then whether that leads the Court to an actual calculation of "grace period."

This dispute centers on the Addendum to the Sattahip Booking Note, which amended the original October 15th laycan date to October 25th, and stated:

> [Plaintiff] to grant 0.5 days grace period each day of which the [Plaintiff] missed the lay-can for all purpose [sic].

Dkt. #23-1 at 72. Pointing to this Addendum, Defendant argues that "grace period" began accruing, at a rate of 0.5 grace days per actual day, beginning October 15, 2015, the original laycan date. Dkt. #22 at 12. Plaintiff argues that Defendant is not entitled to any "grace days" because Plaintiff brought the vessel into Sattahip before the expiration of the amended laycan date, October 25th, and therefore the grace period provision never took effect. Dkt. #28 at 6. The answer lies in how to interpret the term "missed the lay-can." However, the Court must first resolve a choice-of-law issue prior to interpreting that term.

In this case, the Booking Notes have an ambiguous choice-of-law clause stating: "[t]he general maritime law of state of Washington shall be applicable to this agreement." Dkt. #23-1 at 70, Clause 39, and 88, Clause 39. There is no such thing as "general maritime law of Washington." Defendant asserts that any ambiguity should be construed against Plaintiff, which drafted the language, and that Washington law should therefore govern the contract. Dkt. #59-1 at 4. Plaintiff responds that general maritime law governs all disputes in the contract, the clause is unambiguous in its meaning, and therefore it should be interpreted as meaning that the contract

is to be interpreted under general maritime law as appropriately supplemented by Washington law. Dkt. #60 at 4.

The Court has already determined that the choice-of-law clause is ambiguous. "'In cases of doubt, an instrument is to be taken against the party that drew it.'" *Rams v. Royal Caribbean Cruise Lines, Inc.*, 17 F.3d 11, 12 (1st Cir. 1994) (quoting *Chelsea Industries, Inc. v. Accuray Leasing Corp.*, 699 F.2d 58, 61 (1st Cir. 1983)); *see also Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, No. 15-11513, 833 F.3d 1299, 2016 U.S. App. LEXIS 15030, 2016 WL 4361936, at *5 (11th Cir. Aug. 16, 2016) ("[O]nce we conclude a term is ambiguous, the rule of contra proferentem requires us to construe any ambiguities against the drafter."; *Navieros Oceanikos. S.A., Liberian Vessel Trade Daring v. S. T Mobil Trader*, 554 F.2d 43 (2d Cir. 1977) ("[t]he traditional rule of construction, applied in admiralty cases, is to construe contract language...most strongly against its drafter....where the contract language is ambiguous where it is susceptible of two reasonable and practical interpretations[]"). Thus, the Court agrees with Defendant that the choice of law clause should be construed against Plaintiff, and that Washington law governs the contract. This is further supported by the fact that the forum selection by the parties is "the Washington court." Dkt. #23-1, *Teras Deposition Exhibit 19* at ¶39.

Accordingly, under Washington law, the Court may utilize extrinsic evidence to interpret the term "missed the lay-can." *See U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569 (1996). However, summary judgment is only appropriate: (1) if the Court interprets "missed the lay-can" without reference to extrinsic evidence; or (2) if the Court, based on the extrinsic evidence, decides there is a single reasonable interpretation of the Booking Note. *See Oliver v. Alcoa, Inc.*, No. C16-0741JLR, 2017 WL 1498140, at *8 (W.D. Wash. Apr. 25, 2017) (internal citations omitted); *W. Washington Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 102 Wn. App. 488, 495–96, 7 P.3d 861, 866 (2000) ("When extrinsic evidence is used to interpret a

contract, summary judgment is appropriate only if one reasonable inference can be drawn from the extrinsic evidence.").

Defendant argues that the term "missed the lay-can" must be construed as referring to the fact that Plaintiff had missed the initial laycan period expiring on October 15th. Dkts. # 22 at 12-13 and #59-1 at 5. Defendant supports this assertion by pointing to the execution date of the Addendum on October 19, 2015, and the parties' use of the past tense "missed," arguing that the parties could only have intended to refer to the initial laycan date of October 15, 2015, because it was the only laycan period that had been "missed" at that time. Dkt. #22 at 12-13. The Court agrees with that interpretation.

Moreover, the Court agrees that extrinsic evidence makes clear the only reasonable interpretation of the parties' intent was to grant grace time for the delay after the original laycan period. Contemporaneous correspondence between the parties at the time of the negotiation of the Addendum demonstrates that the carrier was seeking an extended laycan date, as well as "additional grace period as delayed dates, after original cancellation date (October 15th)." Dkt. #23-1, *Teras Deposition Exhibit 28*. Likewise, other correspondence noted that the carrier had proposed two options:

> 1. the 0.5 days per each day missing the laycan as grace period (all purpose) for extension of canceling until October 20th. All other terms/conditions remain as per the booking note.

> 2. as per carrier's agent in Sattship [sic], the Sattship [sic] port/berth is heavily congested with 3 vessels in line before the MV NORFOLK, and likely berth will not be available until October 25th.
> Therefore, we can mutually amend the laycan in the B/N to read October 24-28 (instead of October 5-15).
> And in this case, the Charts would not have to pay any demurrage at loadport while vessel waits for berth until October 25th.
> Furthermore, vessel will still arrive in Guanta at the same time because vessel cannot load any earlier due to berth congestion.

Dkt. #23-1, *Teras Deposition Exhibit 29*. The merchant's response was as follows:

ORDER - 10

> We will accept your propose [sic] #1 (the 0.5 days per each day missing the laycan as grace period (all purpose), from the day after original canceling date)
> But we will not pay any additional cost of waiting for berth at Sattahip port.

Dkt. #23-1, *Teras Deposition Exhibit 29*.

The Court is not persuaded by Plaintiff's conclusory argument that such interpretation would render the remaining provisions of the Addendum superfluous. All provisions of the Addendum can be harmonized even with a revised laycan date and the interpretation of the term "missed the lay-can" utilized by this Court. Under the first provision of the Addendum, there could be no cancellation of the MV NORFOLK until after October 25th. Dkt. #23-1, *Teras Deposition Exhibit 27*. Under the second provision, demurrage would not accrue due to swell or congestion (whatever date the boat arrived and issued its Notice of Readiness).[7] *Id.* Under the third provision, 0.5 days grace period would be provided from October 15th (the original laycan period) to the date the carrier issued its Notice of Readiness (which would trigger the running of laytime and any potential demurrage for delays during that time). *Id.* Accordingly, the Court is satisfied that there is no other reasonable interpretation of the term "missed the lay-can" than as referring to the original laycan date of October 15th.

Accordingly, the Court now turns to the parties' arguments regarding the calculation of any grace period. Defendant argues that the grace period available to it accrued from 2400 on October 15, 2015, through 1000 on October 28, 2015 (the date and time it was actually ready to

---

[7] As noted above, demurrage is a reparation paid to the ship owner to compensate for vessel time lost by delays in loading or discharging the cargo. Thus, this provision in the Addendum was intended to protect the carrier if it arrived at the port prior to October 25th and issued its Notice of Readiness (which would trigger the running of laytime), but could not actually load its cargo due to swell or port congestion. The correspondence between the parties at the time the Addendum was negotiated reflects that they did not believe the vessel could berth before October 25th, even though it was expected to arrive at the port ready to load prior to that date. Dkt. #23-1, *Teras Deposition Exhibits 27, 28 and 29*.

ORDER - 11

load), resulting in 6.2187 days of grace period. Dkt. #59-1 at 7. The Court cannot reach such a conclusion on the record before it. The Booking Notes unambiguously state that "Carrier shall give shipper notice of readiness of vessel to load/discharge upon arrival at each loading/discharging port when the vessel is ready to load/discharge cargo, whether the vessel is in berth or not." Dkt. #23-1 at 69. Defendant states that no Notice of Readiness was ever issued, and that no Notice of Readiness is effective until the vessel is actually ready to unload in any event. Dkt. #59-1 at 6-8. That argument runs contrary to the terms of the Booking Notes. Further, the evidence provided by Plaintiff reflects that the MV Norfolk anchored at 0718 on October 24, 2015. Dkt. #61, Ex. A. This is later stated in the "Daily Working Time Records" as "Notice of Readiness Tendered. Dropped Anchor at Sattahip Port Anchorage Area." *Id.*, Ex. B at P000009. Yet, Plaintiff has also admitted, through its agent, that it never saw a Notice of Readiness. Dkt. #58, Ex. 2 at 95:4-8. This raises a genuine dispute of a material fact that cannot be resolved by the Court on summary judgment. Similarly, because the Court cannot determine when laytime began to run (as it cannot determine when a Notice of Readiness was issued), it also cannot determine how much grace time was accrued. Moreover, the Court has already determined that what constitutes a "reasonable time" to load/unload cargo also cannot be resolved on summary judgment. Therefore, the remainder of Defendant's Motion for Summary Judgment will be denied.

## III.    CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS that:

1.   Defendant's Motion for Summary Judgment (Dkt. # 22) is GRANTED IN PART and DENIED IN PART as discussed above. The issues that were raised on summary judgment, but still remain for trial, are whether and when a Notice of Readiness was

issued in Sattahip, what constituted a reasonable time to unload cargo in Guanta, how much grace time was accrued in Sattahip, and how such time applies to any demurrage accrued at any port. Those issues, along with any others not raised and/or resolved on summary judgment, will proceed to trial.

2. The Court previously struck the trial date and remaining pre-trial deadlines, pending the resolution of the instant motion. Given the remaining issues for trial, **no later than seven (7) business days from the date of this Order**, the parties shall submit a joint status report setting forth several proposed new bench trial dates, along with the anticipated trial length given the Court's rulings on summary judgment. The Court will then consider the parties' proposed dates and will issue an amended Scheduling Order, including all remaining pre-trial deadlines starting with a new deadline for motions in limine.[8]

3. As the Court previously informed the parties, if the parties believe that mediation would now be productive, nothing precludes them from engaging in such action.

DATED this 9 day of August, 2017.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

---

[8] When making any motions in limine, the parties should be mindful of the fact this this matter will be tried by the Bench rather than by jury.